WAKONDA STATE BANK, Respondent, v. FAIRFIELD, et al, Defendants. (W. H. MORRISON, Appellant.)

(220 N. W. 515.)

(File No. 5941. Opinion filed July 14, 1928.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Bogue & Bogue,* of Parker, for Appellant.
*Clark & Henderson,* of Yankton, for Respondent.

BROWN, J. This is an action on a note for $4,500 signed by L. D. Fairfield, Louise Fairfield, H. C. Fairfield, and W. H. Morrison. Morrison alone defends, and he sets up as defenses that the note was delivered conditionally, was without consideration as to him, and that his signature was procured by fraudulent suppression of facts, which, had he known, he would not have signed the note. L. D. Fairfield was cashier of plaintiff bank, and a few days before the execution of the note in suit he had executed a note to the bank for $3,500, which appellant had signed as surety. This note was never accepted by the bank, and, while it was in the possession of either the bank or Fairfield, the amount was raised to $4,500. It is not shown who made the alteration, but the appearance of the note after the change led the bank officers to think that the bank examiner would look upon the note with suspicion, and they therefore set out to procure a new note for $4,500. The consideration for the $3,500 note was a $2,000 note signed by L. D. Fairfield, and on which the name of his brother, H. C. Fairfield, also appeared as a maker, but there was some question as to whether the H. C. Fairfield signature was not a forgery. There was about $1,900 owing on that note, and the balance of the $3,500 was made up of defalcation or shortage in L. D. Fairfield's accounts with the bank. The bank knew that this was the entire consideration for the $3,500 note, and that Morrison signed that note only in the capacity of surety for L. D. Fairfield. The bank encountered a good deal of difficulty in getting Morrison to sign the $4,500 note. F. M. Thrane, who was vice president, and had been cashier, of the bank, appears to have taken sick just before appellant's signature was procured, and Charles I. Danforth, a banker in Yankton, and a director of plaintiff bank, as an inducement to appellant to sign the note, told him that Thrane's illness

was due to worry over this Fairfield note, and asked appellant to sign so as to take this burden from Thrane's mind, whereupon appellant, who had an intimate acquaintance with Thrane, said he would sign with the understanding that, if Thrane died, he would pay the note, but, if Thrane got well, his name was to be taken off the note, and with that understanding he signed it. This is the basis of appellant's claim that the note was delivered conditionally, and that, Thrane having got well, the condition on which appellant was to be bound has not happened, and therefore he is not liable on the note.

The trial court eliminated the third defense, that appellant's signature was procured by fraud, and submitted the case to the jury on the issues raised by the defenses of conditional delivery and want of consideration. The jury found for appellant on those issues, but the court granted plaintiff's motion for judgment notwithstanding the verdict.

We think the judgment must be reversed on account of the court's ruling on the third defense, and other alleged errors need not be considered.

Appellant's testimony to the effect that, had he been informed of the delinquency of L. D. Fairfield, he would not have signed the note, was stricken out on motion of plaintiff; the court, in sustaining the motion, saying to the jury:

"Gentlemen of the jury, the court has ruled in this case that, at the time the bank officers took the signature of Mr. Morrison to this note, there was no legal obligation resting upon them to state anything to him with reference to Mr. Fairfield's relation, debtor, creditor, or whatever he had done there in the bank—they were not obliged to disclose anything to him—and that, while we might have impressions in regard to that subject as individuals, the law imposed no obligation of disclosure in this case, so this evidence you have heard of Mr. Morrison that he would not have done so and so if he had known such and such things should be disregarded by you in your consideration and decision of the case."

As has been pointed out, plaintiff knew that Morrison signed this note as surety for L. D. Fairfield, and fraud on the part of the obligee such as will avoid a contract of suretyship is not confined to positive affirmations which are untrue, but may consist in the concealment or withholding by him from the surety,

at the time the contract of suretyship is executed, of material facts affecting the risk, which the obligee has the opportunity, and which it is his duty, to disclose. Copper Process Co. v. Chicago Bonding & Ins. Co. (C. C. A.) 262 F. 66, 8 A. L. R. 1477, and annotation to this case as reported in 8 A. L. R., beginning at page 1485. In the instant case, according to the testimony which was excluded by the court, plaintiff not only withheld from appellant information which, if given, would probably have led him to withhold his signature, but took active steps to prevent appellant from acquiring such information, and even made positive statements in regard to the matter which were untrue. From the excluded testimony, the jury might have justifiably found that the whole $3,500 of L. D. Fairfield's liability to the bank was the result of his embezzlements and possible forgery; that, when this was discovered, he was relieved of his job as cashier, but that the bank officers, while trying to persuade appellant to sign the $4,500 note, in response to his inquiries as to how it happened that Fairfield was out of the bank, told him that he had resigned, and, when asked if Fairfield had been "fired," they said "No"—that he had resigned. The testimony shows that, after a private interview with the directors and some of the officers of the bank in the back room of the bank one evening, Fairfield left the employment of the bank, and that the shortage in his accounts was the reason for this. The jury would have been justified in concluding that the denial that he had been discharged was an untruth. Appellant testifies that the officers of the bank in their conversations with him talked as if the note was for money which Fairfield had borrowed to pay on his house; that they talked all the time as though there was nothing against Fairfield. Among other inducements to get appellant to sign the note, Danforth told him that it would not be so bad to pay, since so many had signed it, and that they would put L. D. back in the bank, and he would work part of it out. It is perfectly plain that they had no intention whatever of putting L. D. back in the bank, and it is equally plain that Danforth was trying to lead appellant to believe that L. D. Fairfield and the other signers were solvent, when he had good reason to believe that nothing could be collected from any of them.

In their effort to get appellant's signature to the note, Thrane, the vice president of the bank, and H. C. Fairfield drove out to

interview appellant at his farm, and, from the evidence excluded, the jury could have believed that on the way out Thrane enjoined upon H. C. Fairfield to say nothing that might arouse Morrison's suspicion as to L. D. Fairfield's defalcation in the bank, because, if Morrison should know about that, he never would sign the note. In 8 A. L. R. 1488, it is said that:

"Very little said by the obligee which ought not to have been said, and very little left unsaid which ought to have been said to a surety, are sufficient to discharge the latter, especially where there is no consideration for the contract of suretyship."

In the case before us there was considerable said which ought not to have been said, and a great deal left unsaid which ought to have been said, in the conversations that occurred between appellant and officers of the bank while they were endeavoring to induce him to sign this note. But respondent contends that all this was immaterial, and that the trial court rightly excluded all evidence on the subject because the Negotiable Instruments Law (Rev. Code 1919, §§ 1705-1905) has done away with the relation of surety as applied to negotiable instruments, and in support of this contention respondent cites a number of cases where it is held that one claiming to have signed a note as surety is primarily liable thereon since the adoption of the Negotiable Instruments Law, and is not discharged by an extension of time granted to the principal without his knowledge. These cases have no application to the situation before us, nor can it be maintained that the Negotiable Instruments Law does away with the relation of principal and surety. Many of the cases cited in the note in 8 A. L. R. 1485, arose long after the adoption of the Negotiable Instruments Law by the states in which the cases were decided, but in none of them does the thought seem to have occurred either to counsel or court that the relation of principal and surety could no longer exist between several makers of a negotiable instrument.

Respondent quotes from the syllabus in the case of Merchants' National Bank v. Smith, 59 Mont. 208, 196 P. 523, 15 A. L. R. 430, this paragraph:

"The Uniform Negotiable Instruments Act * * * supersedes the law of suretyship * * * as theretofore applicable to negotiable instruments,"

—and contends that this and other cases cited in appellant's brief shows that "the law of suretyship does not apply to negotiable instruments." The cases cited do not justify the conclusions that respondent draws from them. In Merchants' National Bank v. Smith the court simply held that one of two persons who signed a promissory note as makers could not show as against a holder in due course that he was not primarily liable, but was a surety, and therefore only secondarily liable. But further on in the opinion the court says:

"If the bank is not a holder in due course, this case is not within the purview of the act and its rights and [liabilities] are to be determined by the law applicable to simple contracts generally, under which the defense of suretyship may be maintained."

██ ██ Under the decisions of this court plaintiff is not a holder in due course. Britton Milling Co. v. Williams, 45 S. D. 274, 187 N. W. 159, 21 A. L. R. 1352; Tripp State Bank v. Jerke, 45 S. D. 448, 188 N. W. 314. Therefore appellant may show that, as between himself and respondent, he signed the note only as surety.

██ Fraud vitiates the execution of a negotiable instrument just as it does that of any other contract. Section 55, Uniform Negotiable Instruments, which is section 1759 of our Code, expressly declares that, when one obtains any signature to the instrument by fraud, his title thereto is defective.

The trial court erred in excluding the evidence offered tending to show that appellant's signature was induced by fraud, and the judgment is reversed.

BURCH, P. J., and POLLEY and SHERWOOD, JJ., concur.
CAMPBELL, J., dissents.